## DOAN v. DYER.

(Circuit Court of Appeals, Ninth Circuit. February 5, 1923.)

No. 3915.

1. **Partnership ⊕⇒5—One may participate in profits from particular property without becoming partner as to other property or acquiring interest in the particular property.**

   Agreement can be made between two parties whereby one shall participate in the profits arising from the engagements of particular property without his becoming a partner with respect to other properties, or even without his acquiring an interest in the property itself, so as to effect a change of title.

2. **Partnership ⊕⇒3—Community of interest essential, but does not create partnership.**

   In a partnership there must be a community of interest, but every community of interest does not create a partnership.

3. **Partnership ⊕⇒20—Particular formalities or express agreement not required.**

   No particular formalities are required in entering on a contract of partnership, and an express agreement is not necessary, if the acts or contracts of the parties have legally created a partnership.

4. **Partnership ⊕⇒53—Evidence held to show partnership to deal in oil lands and property.**

   Evidence *held* sufficient to establish the existence of a partnership between plaintiff and defendant in oil lands and oil property, and to show that it covered oil lands or property in Louisiana, as well as Texas and elsewhere.

---

⊕⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**5. Partnership ⊕⇒97—Partner will not be permitted to gain for himself at firm's expense, and must account to copartner for profits made.**

Profits made in the course of a partnership belong to the firm, and one partner will not be permitted to make gain for himself at the expense of the firm, but must account to copartner fully and with the utmost good faith.

**6. Partnership ⊕⇒97—Member having title to firm's stock bound to disclose facts concerning right to take additional stock, and, not having done so, to account for such stock taken by him.**

Where stock owned by plaintiff and defendant as partners was in defendant's name, defendant was a trustee, and should have disclosed to plaintiff the fact that additional stock was offered to stockholders in proportion to their holdings at much less than its real value, and, where he did not do so, was bound to account to plaintiff for additional stock taken by him.

**7. Partnership ⊕⇒75—Rule as to disallowance of interest on advances made by partner to firm held properly applied.**

Where one partner was to use his skill in finding oil properties, and the other in finding the money to finance them, and they were to be equally interested, the court *held* to have properly applied the general rule that, in the absence of express agreement to pay interest on advances made by either partner to the partnership, no interest should be allowed.

Appeal from the District Court of the United States for the Second Division of the Northern District of California; Frank H. Rudkin, Judge.

Action by B. T. Dyer against L. E. Doan. Judgment for plaintiff, and defendant appeals. Affirmed.

C. W. Durbrow and John Breuner, Jr., both of San Francisco, Cal., for appellant.

W. H. Metson and R. G. Hudson, both of San Francisco, Cal., for appellee.

Before GILBERT and HUNT, Circuit Judges, and WOLVERTON, District Judge.

HUNT, Circuit Judge. Dyer pleaded an oral agreement of partnership with Doan for the general purpose of acquiring and selling oil lands and leases and interests in oil property. He averred that under the agreement each should give his attendance and time to the business of the partnership, that each should furnish to the partnership such moneys as would be necessary to promote and carry on the business and purposes of the partnership, and that they would divide the profits, if any, between them share and share alike, and would account for all moneys received and paid. The complaint alleged dealings in certain oil lands and leases and properties, that the partnership was never dissolved, that Dyer lived up to the partnership agreement, but that Doan wrongfully applied moneys and properties of the partnership to his own use and refused to pay over and account. The prayer was for dissolution of the partnership and for accounting. Doan denied any agreement of partnership.

The District Court held that there was a copartnership, which was dissolved on the 22d day of March, 1920. After an accounting, final

decree was entered, defining the respective interests of the parties. Doan appealed.

Appellant presents two principal questions: Under the facts, was there the legal relationship of partners between the parties? And, if such legal relationship did exist, was the decree determining the respective rights and interests just and correct?

[1, 2] It is accepted that an agreement can be made between two parties, whereby one shall participate in the profits arising from the engagements of particular property, without his becoming a partner with respect to other properties, or even without his acquiring an interest in the property itself, so as to affect the change of title, as instanced in London Assurance Co. v. Drennen, 116 U. S. 461, 6 Sup. Ct. 442, 29 L. Ed. 688, and, of course, there must be a community of interest in a partnership, although not every community of interest creates a partnership. But it is unnecessary to elaborate upon more general definitions of partnership, for section 2395 of the Civil Code of California provides that a partnership is an "association of two or more persons, for the purpose of carrying on business together, and dividing its profits between them," and we are aided in the application of that definition through the learned discussions by the Supreme Court in Westcott v. Gilman, 170 Cal. 562, 150 Pac. 777, Ann. Cas. 1916E, 437; Chapman v. Hughes, 104 Cal. 302, 37 Pac. 1048, 38 Pac. 109; Krasky v. Wollpert, 134 Cal. 338, 66 Pac. 309; Lanpher v. Warshauer, 28 Cal. App. 457, 152 Pac. 933. After all, the several cases referred to are in accord with the language in Meehan v. Valentine, 145 U. S. 611, 12 Sup. Ct. 972, 36 L. Ed. 835, where Justice Gray said:

"The requisites of a partnership are that the parties must have joined together to carry on a trade or adventure for their common benefit, each contributing property or services, and having a community of interest in the profits."

[3] We have in mind, too, the established doctrine that no particular formalities are required in entering upon a contract of partnership. Express agreement is not necessary; the relation may grow out of transactions and dealings in which the word "partnership" was never uttered (Mechem's Elements of Partnership, § 59), and if the acts or contracts of the parties have legally created the relationship that relationship must ensue. Jacobs v. Shorey, 48 N. H. 100, 97 Am. Dec. 586; Johnson v. Carter, 120 Iowa, 355, 94 N. W. 850; Wade v. Hornady, 92 Kan. 293, 140 Pac. 870.

[4] Turning to the evidence, and referring only to the several parts of it which impress us as most significant, we have this situation: Dyer and Doan, who were in the oil land business and brokerage, were on intimate terms, and for several years had their offices together in San Francisco. In March, 1918, J. F. Lucey, in Texas, telegraphed to Dyer that the Ranger oil field, in Texas, offered great possibilities, and that Dyer and Doan could make a great success; that it would require two persons. The telegram read in part:

"You and Doan have the necessary combination of ideas and energy to make good."

Dyer showed the telegram to Doan, and thereafter, about May, 1918, while in New York, telegraphed to Doan, at San Francisco, that Lucey and Carr, just from Texas, reported the Texas field "wonderful," and advised Doan to see whether Fleischacker was interested "to go in the game with us; otherwise, believe Toronto crowd will back me." After a trip to Texas, Dyer returned to San Francisco in August, saw Doan, and talked with him. His testimony was that he told Doan of his investigations in Texas, and that they then entered into a partnership; Dyer agreeing to go to Texas and go into the oil business, with the understanding that Doan would follow him when he could, and that they would go in together and divide profits. They discussed the matter of financial aid as coming from two persons, Lucey and Titus. Dyer returned to Texas in September, and Doan followed in November, and at Fort Worth they occupied the same room at a hotel. During the summer before Doan went to Texas, in answering a letter Dyer had written, Doan expressed satisfaction over the opportunities in the Texas fields, and wrote that he thought the best way to "handle the situation" was according to "our first hunch," but that "before we can expect to do any business we must have the money first." Doan specified $100,-000 as necessary, and wrote that, when Dyer had some "good things lined up, so we have something to talk about, we should then get busy and raise the money," and that Lucey and Titus would go in. "We must have a finished deal, so we can act without hindrance or delay."

Dyer seems to have been active and carried on several oil land lease transactions in Texas and Oklahoma, which showed large profits to himself and Doan. About April, 1919, Doan went to Louisiana, and soon afterward returned to Texas and met Dyer, and Dyer says they discussed certain Louisiana properties and their respective interests in the "Doan Oil Company," a corporation which Doan had organized while in Louisiana. Doan had access to financial resources, and most of the business done by Dyer was transacted in Doan's name, although it is proven that in several "deals" Dyer advanced some of his own funds. In the documentary evidence we find that, in a letter dated San Francisco, February 15, 1919, Doan wrote to Dyer at Fort Worth, Tex., that it would be a good idea for him (Dyer) to go down to Houston and *Shreveport* (italics ours) and get things "lined up" in those fields before he (Doan) arrived, and that if Hoover and Lucey failed to "come through" he (Doan) could depend upon Titus, and "will want to look all the fields over and pick something good. * * * With all the different lines we can work when we get started, there will be plenty for us to do and we will make good."

Referring to the Doan Oil Company, it appears that on April 10, 1919, Doan, who was then in Louisiana with Titus, bought oil property in Louisiana, and to the newly formed corporation transferred certain oil lands in Texas and Oklahoma. The capital stock of the company was $500,000, of which 300,000 shares were issued, 150,000 to Titus, 100,000 to Doan, and 50,000 to Lucey. It appears, however, that in consummating the transaction Doan did not advance any of his own money until September, 1919. Soon after Doan formed the Doan Oil Company, on May 16, 1919, he telegraphed to Dyer in Texas that

whatever Dyer did in the matter of selling certain property in Texas would be satisfactory, and added:

"We have bought several pieces. Will tell you details later this week. Like best place to do business."

Again, two days later, on May 18, he telegraphed to Dyer concerning the sale in Texas and added:

"We have made big purchases here. Wonderful properties and need the money. Wire me to-morrow before noon exact condition of neighbor's well; also prospect of sale. I go Fort Worth to-morrow night. Titus goes to Washington."

A further circumstance of importance is a telegram sent by Doan on June 11, 1919, from San Francisco to Dyer, Wichita Falls, Tex., advising Dyer that Doan would arrive at Fort Worth on Sunday and leave for Shreveport Sunday night, and saying:

"Have arranged everything satisfactory. Glad to hear good news."

Dyer testified that this telegram pertained to the Giffin well in Louisiana. Afterward Doan sent several telegrams at different times, telling Dyer that things looked well; that he was going to Southern Louisiana to look over some leases, and in one said that they were drilling wells and would start another; that after the wells were completed he hoped "we will have production enough to take care of our future development, so that we will not be in need of any money." Doan also advised Dyer of the sale of 1,500 acres of Bull Bayou Louisiana property. Indeed, as late as December, 1919, Doan advised Dyer concerning the drilling of wells in the Louisiana properties. We observe here that it is impossible to reconcile these messages with the argument that about May 30, 1919, the previous agreement between the parties was canceled and rescinded by mutual consent. Undoubtedly, about October, 1919, Doan changed his attitude, for under date of October 12th he wrote Dyer that, while there was a big boom on in Shreveport, he had not seen anything that he could recommend to "your crowd," and as—

"I said before, I cannot afford to mix up with you on any outside deals in Louisiana. I don't want to be criticized by Titus and Cap Lucey; so I think it the better policy to confine your operations to Texas and Oklahoma for the present. Just forget about this thing over here. I think I am capable of handling it, and there is no room down here for two of us. No one can criticize your ability or integrity. I think I have demonstrated my faith in you. Everything will come out fine, if we all keep our noses to the grindstone for another year. Let me know what you have in mind by letter, and if there is anything to be done, when I can co-operate, I will be glad to do it."

The Louisiana properties brought about serious differences and in November Dyer wanted a settlement from Doan but failed to get one, and in March they quarreled at Shreveport and the partnership was broken up. There is much evidence concerning payments for options and leases, and also of advances made by Titus and Lucey in connection with certain transactions, but it does not seem necessary to state it.

Doan's testimony was that he and Dyer were acting independently and that Dyer was an agent—not a partner—and as a fact owed him

considerable money for stock in another corporation which he had agreed to let Dyer have; that Dyer was to be paid by a division of commissions or profits; that in the early part of January, 1920, he told Dyer that, if he would pay him $1 per share for the Doan Oil Company stock, he would "give" him 50,000 shares, to which proposition Dyer agreed; that he agreed to let Dyer have this stock in order to avoid any "controversy" with him, and that the understanding was that, if Dyer would, on the following day, send certain moneys to pay for the Texas stock, he (Dyer) could have 50,000 shares of the Doan Oil Company stock at $1 per share, but he testified that when he saw Dyer in February, 1920, he refused to finance another proposition that Dyer had written to him about, because Dyer had not complied with the "compromise proposition," in that he had failed to send Doan the money which he had promised to send the day after they had had their talk about the Texas corporation stock. He also testified that he told Dyer that the proposition "was all off between them."

On the other hand, corroborative circumstances showing that there was a partnership are that on May 15, 1919, Doan telegraphed from Shreveport to Dyer, at Fort Worth, concerning the sale of pieces of property in Texas, and on January 23, 1920, Doan wrote to Dyer that, if he (Dyer) had to give up a one-quarter interest in a certain piece of property in Louisiana to raise his (Dyer's) money, "I will do it for you on the same basis." There is also the testimony of several disinterested witnesses that in 1919 and 1920 Doan admitted that Dyer was interested with him in the Louisiana business, under an arrangement whereby Dyer was to take care of their business in Texas, and that Doan was to take care of the Louisiana end of it.

Without extending references to the evidence, we are satisfied that, considering Doan's letter telling Dyer to go to Shreveport, La., together with all the other written evidence and the conduct of the parties themselves, the intention of the parties was to create a partnership which covered whatever oil land or oil property was acquired in Louisiana, as well as Texas and elsewhere. The partnership was formed before the money was to be raised, with the purpose in mind of having Dyer go to the oil regions to look up good properties, in order to give the partnership a basis for raising the $100,000 needed for the firm. Dyer was to use his skill in finding good properties, and Doan was to use his in finding the money, and they were equally interested.

[5] The partnership relationship having been established, and the Doan Oil Company being an asset, we must look into the question of accounting. We do so with adherence to the principle that it was the duty of Doan to account to Dyer fully and with the utmost good faith. Profits made in the course of a partnership belong to the firm, and one partner will not be permitted to make gain for himself at the expense of the firm.

[6] The appellant objects to the ruling that Dyer had a right to a portion of a second issue of stock in the Doan Oil Company. The District Court found that 100,000 shares of the Doan Oil Company stock, of the par value of $1 each, belonged to Doan and Dyer under their partnership arrangement, and that the cost thereof was $100,000; that

afterwards, November 10, 1919, the board of directors of the company offered an additional 100,000 shares of capital stock, of the par value of $1 per share, to its stockholders, to be paid for in two equal installments, on or before December 15, 1919, and January, 1920; that this additional stock was offered to the stockholders of the company in proportion to their holdings as of November 10, 1919, and that under the offer 33,333 shares were allotted to Doan, and thereafter taken by him or his nominees at $1 per share; that Dyer had no notice of this action of the board, and no opportunity to take the additional stock; and that the right to purchase the 33,333 shares was a valuable asset to the copartnership. It was therefore adjudged that Doan should account to Dyer for the 33,333 shares, and that that number of shares should be disposed of and divided in the same way as the original issue to the defendant Doan of the 100,000 shares.

The court was right in regarding Doan as a trustee for the stock, and in the exercise of the plainest good faith Doan should have made full disclosure to Dyer, so that he could have had an opportunity to buy at $1 per share. The value of the right was great, as the evidence is that the stock was then worth much more than $1 per share. Dennis v. Gordon, 163 Cal. 427, 125 Pac. 1063.

[7] It is contended that the court erred in refusing to allow Doan interest upon all moneys advanced by him as set forth in Doan's amended account, which charged interest on moneys "advanced by Doan"; the interest being computed for a term represented by the time the moneys were paid by Doan until the date of the account. The District Court affirmed the ruling of the master, holding that each of the partners should be allowed interest from the date of the end of the partnership to the date of the filing of the report and account. Such a ruling is in accord with the weight of authority that, in the absence of an express agreement between the parties to pay interest on advances made by either of them to the partnership, no interest should be allowed. We cannot agree to the contention that the facts of the present case except it from the operation of the general rule, for the evidence is that Doan and Dyer were to raise $100,000, and of this sum it appears that Titus furnished $40,000. Titus, however, received shares of stock, and Doan ought not to be paid interest on moneys which Titus advanced or on moneys which Lucey advanced. Nor can we agree that Dyer was to pay Doan $50,000 as for a personal loan from Doan to Dyer. As bearing upon these points we cite Sanford v. Barney et al., 50 Hun, 108, 4 N. Y. Supp. 500; Dexter v. Arnold, 7 Fed. Cas. No. 3,855; Young v. Canfield, 33 Cal. App. 343, 164 Pac. 1134; Tirrel v. Jones, 39 Cal. 655; Seibert's Assignee v. Ragsdale, 103 Ky. 206, 44 S. W. 653; 30 Cyc. pp. 440, 441.

Our conclusion is that the decree made is just, and must be affirmed. Affirmed.