**PROTEST OF REID et al.**

No. 22561.   Opinion Filed Oct. 25, 1932.

4

Rainey, Flynn, Green & Anderson, Howard Patton, and Bleakmore, Barry, Farmer & Lee, for protestants.

Jas. H. Young, Co. Atty., C. W. Herod. City Atty., and J. B. Dudley, for protestee.

ANDREWS, J. This is an appeal from a judgment of the Court of Tax Review as to certain tax levies of the city of Woodward for the fiscal year commencing July 1, 1930. David Reid, George Irwin and others, and the Atchison, Topeka & Santa Fe Railway Company and the Missouri, Kansas & Texas Railway Company of Texas filed protests in that court. The three protests were consolidated and tried together. The Court of Tax Review held "* * * that the sum of $332,046.25, cash on hand from the sale of the light plant, and now to the credit of the light fund, does not have to be paid into the sinking fund, and might

be dealt with by the city council in such ways as it may decide are the best interests of the city, but does hold the attempted appropriation on the part of the mayor and city council appropriating for the building of additions to the city in the way of gas plants and light plants is void, and have to be appropriated by the county excise board." From that judgment the protestants appealed to this court.

The facts disclosed by the record are substantially as follows: The city of Woodward was the owner of a municipal light and power plant which it had constructed from the proceeds of the sale of a bond issue authorized by the voters of that city for that purpose, pursuant to the provisions of section 27, art. 10, of the Constitution, to which plant additions, extensions, and repairs had been made from the proceeds of the sales of other bond issues authorized by the voters of that city pursuant to the same constitutional provision. It sold the plant under the provisions of chapter 94, Sess. Laws 1927. An attack upon the sale was made and the legality of the sale was sustained by the decision of this court in Thomas v. Reid, 142 Okla. 38, 285 P. 92. Thereafter, and about the 14th day of March, 1930, the city received $505,000 in cash as the proceeds of the sale. A portion of that sum was disbursed by the city in payment of indebtedness of the city for machinery and equipment used in the plant and a portion thereof was transferred to the sinking fund. The balance, $326,503.07, was held in a special fund on the 30th day of June, 1930. On July 7, 1930, the governing body of the city, by resolution, attempted to appropriate that amount for various purposes, including construction of a light plant, gas plant, and sewer system.

On or about the 13th day of August, 1930, the city tendered into the federal district court the sum of $326,000 for the use and benefit of the plaintiff in that action, who was the vendee of the purchaser from the city of the light and power plant, the tender being made in support of the claim of the city that the sale of the light and power plant was void and that it should be set aside and held for naught. The money was not paid into court.

The protestants contend that the entire amount of the proceeds of the sale, after the payment of the indebtedness of the city for machinery and appliances for the use of the plant, should be credited to the sinking fund of the city, and that the excise board should have considered that amount

as a part of the sinking fund in fixing the rates of ad valorem tax levy for the fiscal year in question.

The city contends:

"After the sale of a municipally owned utility, it is the plain duty of such municipality to devote from the proceeds of the sale a sum sufficient to retire the unmatured bonds which were issued for the purpose of constructing such utility. * * * However, when the municipality has made such provision for meeting all the future interest and accruals of the bonds against the utility which was sold, it has performed its duty to the sinking fund, and completely met all the requirements of law in that regard."

An issue is thereby presented. That issue is dependent upon the meaning of section 16, art 10, of the Constitution. By the provisions of that section, "All laws authorizing the borrowing of money by and on behalf of the state, county, or other political subdivision of the state, shall specify the purpose for which the money is to be used, and the money so borrowed shall be used for no other purpose." That is a part of the public policy of the state. City Nat. Bank v. Inc. Town of Kiowa, 104 Okla. 161, 230 P. 894. The question is presented as to whether that constitutional limitation relates to subsequent uses of the borrowed money as well as to the first use thereof. That it relates to the first use thereof has been determined by this court in Re Bliss, 142 Okla. 1, 285 P. 73, and Aaronson v. Smiley, Co. Treas., 142 Okla. 29, 285 P. 59, wherein we held that accrued interest on bonds and the net premium derived from the sale of bonds should be credited to and held in the sinking fund for the purpose of reducing the rate of ad valorem tax levy necessary to pay the interest thereon and to create a sinking fund for the retirement thereof. That it relates to a subsequent use thereof has been held by this court in Gulf, C. & S. F. Ry. Co. v. Excise Board, 141 Okla. 34, 283 P. 1003, wherein we held:

"Where a municipality borrows money for the purpose of purchasing or constructing a water and light plant and thereafter sells the same and receives payment thereof partly in cash and partly in promissory notes evidencing the unpaid portion, interest collected on the notes and the amount evidenced by the notes must be credited to the sinking fund for the purpose of paying the interest on the bonds evidencing the indebtedness and to retire the said bonds at maturity."

In the language of this court in that case, the record in this case does not show the

amount in controversy to be a profit derived from the operation of a public utility. The record in this case shows that a public utility has been converted into money by reason of the sale thereof for a cash consideration. Section 16, art. 10, of the Constitution is a limitation. To construe it to apply only to the first use of the borrowed money would be to defeat its practical operation, for money might be borrowed to build a light plant and the money so borrowed might be used to build a light plant, but the light plant might be sold and the proceeds of the sale might be used for some other purpose. We cannot give the section a construction which would operate to defeat the purpose thereof.

Section 27, art. 10, of the Constitution is a limitation as to the purpose for which indebtedness may be incurred. The indebtedness incurred pursuant thereto may be used only for the purpose of "* * * purchasing or constructing public utilities, or for repairing the same, to be owned exclusively by such city. * * *" Under the provisions of that section any city or town may become indebted in any amount for the purposes therein stated. That limitation as to the use of the borrowed funds is applicable to subsequent uses as well as to the first use thereof. We cannot hold that the makers of the Constitution, by the adoption of section 27, art. 10, of the Constitution, intended to provide a scheme or plan by which the limitation contained in section 16 and section 9, art. 10, of the Constitution might be nullified. If the construction requested by the city officials were given, it would enable the municipal officers of a city that had incurred an indebtedness under the provisions of section 27, art. 10, of the Constitution, for the purpose of purchasing or constructing a public utility or for repairing the same, with the consent of the voters, to sell the public utility, and, without the consent of the voters, to use the proceeds of the sale for purposes other than those that are provided by that section and to defeat the limitations on the rate of ad valorem taxation contained in section 9, art. 10, of the Constitution. In the language of this court, in O'Neil Engineering Co. v. Inc. Town of Ryan, 32 Okla. 738, 124 P. 19:

"It has been said that the strict enforcement of these constitutional and statutory limitations and restrictions against municipal indebtedness, which may require the invalidation of contracts, will often result in hardship. This may be true. * * * But the hardships that may so arise are not comparable with those to be suffered by the citizens of this commonwealth, if these wise and salutary limitations, imposed by the people themselves against themselves, shall be swept aside, or evaded by ingenious reasoning, to meet the supposed necessities of a situation, or even the apparent equities of a particular case."

We, therefore, hold that the provisions of sections 16 and 27, art. 10, of the Constitution are applicable not only to the immediate use of the money borrowed, but to any subsequent use thereof, and that they apply as well to the proceeds of the sale of the property purchased with borrowed money as to the borrowed money with which the property was purchased.

When a municipal utility, which was purchased, constructed, or repaired with borrowed money, is converted into money by reason of a sale of the property, the proceeds of the sale are controlled by the provisions of sections 16 and 27, art. 10, of the Constitution, and may be used only for the purpose for which the money was borrowed. Where the proceeds of the sale are not used for the purpose for which the money was borrowed, they must be used to reimburse the taxpayers.

In the instant case the light and power plant was constructed from the proceeds of the sale of bonds issued pursuant to the provisions of section 27, art. 10, of the Constitution, approximately 20 years ago. See City of Woodward v. Rainer, 29 Okla. 493, 119 P. 964, in which this court reversed a judgment of the district court granting an injunction against the issuance of bonds in the amount of $30,000 for the construction of a light plant by the city of Woodward. Extensions, improvements, and repairs were made at subsequent dates from other funds derived from the sale of bonds issued pursuant to the provisions of section 27, art. 10, of the Constitution. When a municipally owned public utility, which was purchased, constructed, or repaired under the provisions of sections 16 and 27, art. 10, of the Constitution, is sold by the municipality, the proceeds of the sale may be used for the purpose for which the money was borrowed, under the statutory provisions and the ordinances and charter provisions of the city with reference to the expenditure of public funds. If not so used, an amount equal in value to the amount of all of the indebtedness incurred by the municipality for the purchase, construction, or repair of the same, with all of the interest thereon, whether matured and paid or unmatured, must be paid into the sinking fund, and the

remainder thereof must be paid into the current expense fund, to reimburse the ad valorem taxpayers of the city for the amount of taxes paid by them or chargeable against their property by reason of the incurring of the indebtedness. We are unable to determine from the record the proportion in which the proceeds of the sale should be so applied.

The protestants contend that when the city of Woodward sold its light and power plant, all rights incident to the operation or ownership of the utility were canceled and lost, and that the city could re-enter the light and power business only by following the method and procedure outlined in the Constitution.

That contention was not germane to any issue before the Court of Tax Review and it will not be considered by this court on appeal. The Court of Tax Review was in no wise concerned with the question of whether or not the city of Woodward could have used any portion of the proceeds of the sale of the plant for the construction of a new light plant, for two reasons: First, the city of Woodward did not attempt to use any portion of the proceeds of the sale of the plant for the construction of a new light plant during the fiscal year in which the proceeds thereof were received; and second, it did not make any appropriation from the proceeds of the sale of the plant for the construction of a new plant during that fiscal year. The proceeds of the sale of the plant were received by the city on March 14, 1930. The portion thereof in controversy was on hand at the close of that fiscal year. Under date of September 10, 1928, four days prior to the date of the election at which the voters of the city of Woodward authorized the sale of the plant, the governing body of the city provided by resolution that the balance of the purchase price, after the payment of the claim of the Fairbanks-Morse Company, and the interest accruing thereon, should be placed in a separate fund and held separate and apart from other moneys, for the purpose of retiring the outstanding bonded indebtedness of the city as the same became payable. It is not necessary to determine whether or not that action amounted to a legal appropriation of the proceeds of the sale of the plant, for no other action with reference to the proceeds of the sale of the plant was taken until the 7th day of July, 1930. At the close of the fiscal year commencing July 1, 1929, the money in controversy was revenue of the city unappro-

priated for any purpose, unless it was appropriated as provided by the resolution of September 10, 1928. The city of Woodward took no action prior to the 7th day of July, 1930, from which this court can conclude that there was any municipal intention to use any portion of the proceeds of the sale of the plant for the construction of a new light plant. We, therefore, hold that at the end of the fiscal year commencing July 1, 1929, the balance on hand from the proceeds of the sale of the plant was an unappropriated balance on hand, subject to the constitutional and statutory provisions as to unappropriated balances of revenue.

While a municipal electric light and power plant may be operated without the aid of ad valorem taxation and when so operated is not subject to the statutory provisions as to appropriations and the fixing of tax levies, it may be operated under the ad valorem tax statutes of the state, and when it is so operated it is subject to those provisions. In re Bliss, supra. No matter how it is operated, the money collected therefrom must be accounted for, as required by the provisions of section 30, art. 10, of the Constitution, section 12676, O. S. 1931 (section 9697, O. O. S. 1921), and section 12674, O. S. 1931 (section 9695, C. O. S. 1921). By those provisions municipal officers are required to make reports in writing showing by classes the earnings and costs of maintenance thereof and the true fiscal condition of the municipality as of the close of the fiscal year. While the profits derived from the operation of such a plant may be applied by the municipality to the operation of the plant or to any other legal purpose (St. Louis-S. F. Ry. Co. v. Andrews, Co. Treas., 137 Okla. 222, 278 P. 617; Pitts, Co. Treas., v. Allen, 138 Okla. 295, 281 P. 126; Perrine v. Bonaparte, Co. Treas., 140 Okla. 165, 282 P. 332; St. Louis-S. F. Ry. Co. v. County Excise Board, 142 Okla. 176, 286 P. 345; St. Louis-S. F. Ry. Co. v. Bonaparte, Co. Treas., 142 Okla. 177, 286 P. 343, and Blake, Co. Treas., v. Abraham, 149 Okla. 112, 299 P. 488), they must be so applied during the fiscal year in which they are received, and, if there is a balance on hand therefrom at the close of the fiscal year that has not been appropriated by valid resolution or ordinance for some legal purpose, that balance must be considered as a resource in determining the amount of money to be raised by ad valorem taxation for the next fiscal year. In re Bliss, supra.

A financial statement is required to be made by the city officers on the first Mon-

day in July of each year as of the close of business on June 30th of the preceding fiscal year. The governing body of the city of Woodward met on the 7th day of July, 1930, that being the first Monday of July, 1930, and attempted to make the appropriations hereinabove referred to. We are thus confronted with the legal question of whether or not the proceeds of the sale of the plant on hand June 30, 1930, and unappropriated, might be appropriated on the 7th day of July, 1930, as was attempted to be done. Our answer to that question is that there was no such power in the governing body of the municipality. The unappropriated balance on hand at the close of the fiscal year ending June 30, 1930, was required, by the provisions of section 12678, O. S. 1931 (section 9699, O. O. S. 1921), to be deducted in determining the rates of ad valorem tax levy for the ensuing fiscal year. That statute provides for the deduction of "* * * the amount of any surplus balance of revenue or levy, ascertained to be on hand from the previous fiscal year or years. * * *" "Revenue," as used therein, means income from sources other than ad valorem taxation. In re Monsell, 142 Okla. 130, 285 P. 836.

The amount in controversy herein was revenue on hand from the previous fiscal year or years. It had not been appropriated, and by the provisions of that section it was required to be deducted by the excise board in determining the rates of levy for the municipality for the ensuing fiscal year, under the rule stated by this court in Re Bliss, supra. We, therefore, hold that revenue of a municipality derived from the sale of a municipal light and power plant on hand at the close of the fiscal year, and not theretofore appropriated by the municipal authorities for some lawful purpose, must be considered by the excise board in fixing the rates of levy for municipal purposes for the ensuing fiscal year. We are not unmindful of the fact that the application of this rule may operate to prevent a municipality from building up a reserve for the operation of a municipal light and power plant. In the language of this court in Re Town of Afton, 43 Okla. 720, 144 P. 184:

"To this suggestion we reply that when the question of enforcing a plain provision of the organic law is presented on one side, and policies and hardships on the other, our duty is clear, and we have no choice. The plain provisions of the Constitution must be obeyed and followed, not only by the courts, but by every one; and it is the solemn duty of this court, when its jurisdiction is properly invoked, to maintain and not destroy or impair the wise provisions of this sacred document."

It is urged that the municipal officers have tendered into the federal court the amount of the funds in controversy, and that to require the use of those funds as herein provided will defeat a right of recovery of the city in case it is successful in that litigation. Since the city has not tendered into the federal court the full amount received by it from the sale of the light plant, its right to recover in that case cannot be prejudiced. If a tender is necessary in that cause, it is of the entire amount received by the city and not a part thereof. Whether or not a tender is necessary in that case, we know of no provision of law that authorizes a municipality to hold a fund in excess of $300,000 and, at the same time, impose a tax upon the property owners of the municipality for the operation of the municipality.

The Court of Tax Review is directed to ascertain the amount that should be credited to the sinking fund, under the rule herein stated, and to apply that amount to that fund in determining the rate of ad valorem tax levy for that fund. It is further directed to apply the remainder of the amount to the current expense fund in determining the rate of ad valorem tax levy for that purpose. If the amount that should be credited to the sinking fund is in excess of the needs of that fund for all purposes, including unmatured interest and accruals, the remainder thereof should be credited by the Court of Tax Review to the current expense fund and used to reduce the rate of ad valorem tax levy for that purpose. If the amount that should be credited to the current expense fund is in excess of the total needs of that fund, the excess constitutes unappropriated funds on hand for the fiscal year commencing July 1, 1930.

The judgment of the Court of Tax Review is reversed and the cause is remanded to that court for further proceedings in conformity herewith.

LESTER, C. J., CLARK, V. C. J., and RILEY, HEFNER, and CULLISON, JJ., concur. McNEILL and KORNEGAY, JJ., dissent. SWINDALL, J., not participating.

---

McNEILL, J. (dissenting). I dissent. This is an appeal from the Court of Tax Review and involves the right of the city authorities of the city of Woodward to appropriate for another electric plant. a gas

plant, and sewer improvements for said city, the balance remaining from the proceeds of the sale of its municipally owned light plant after the setting aside of sufficient funds with which to take care of the outstanding bonds which were voted to building said plant sold by the municipality.

The parties will be referred to as protestants and protestees, respectively, the protestants being the Atchison, Topeka & Santa Fe Railway Company, David Reid et al., and the protestees, the county excise board of Woodward county.

It is my view that the governing body of the city of Woodward was not required by law to transfer any of the moneys received from the sale of its light plant into the general or sinking fund, and that the city, acting through its governing body, could have used this entire amount, or any portion thereof, received from the sale of its light plant, which amount it had placed in a special fund, in the exercise of good faith, for any lawful enterprise, such as constructing another light plant, gas plant, and sewer improvements, as is contemplated by said city, so long as said city did not ask for an ad valorem tax for any project in which it was placing such fund; and, a fortiori, in the exercise of the discretion of its governing body, said governing body could have placed the entire amount of the proceeds of said sale, or any portion thereof, into the general or sinking fund. There is no general or statutory law, or any charter provision, prohibiting such disposition of said fund by the governing body of said city.

It appears that, on August 17, 1910, and prior to June 4, 1928, the city of Woodward voted on the question of issuing bonds in the sum of $30,000 for the purpose of providing funds for the construction of an electric light plant in said city, and the sum of $35,000 for the construction, additions, extension, and repairs to a system of waterworks, and the levying and collecting of an annual tax upon all of the taxable property in said city, sufficient to pay the interest on said bonds as it fell due, and also to constitute a sinking fund for the payment of the principal of said bonds within 25 years from the date of said bonds, dated September 1, 1910, as same became due and payable at such time or times, but not more than 25 years from their date, as the council may prescribe, and to bear interest at the rate of six per cent. per annum payable semi-annually. (See City of Woodward v. Raynor, 29 Okla. 493, 119 P. 964.)

Said city thereafter voted other and additional bonds for said plant, owned and operated its light and power plant pursuant to authority contained in article 18, sec. 6, and under the procedure provided in article 10, section 27, of the Constitution. Pursuant to chapter 94, Sess. Laws 1927, p. 155, proceedings were commenced to sell said municipal plant in response to a proposal from the Western Light & Power Corporation, a Kansas corporation, to buy said plant from said city for $505,000, in cash, and on June 4, 1928, the city of Woodward advertised for bids to sell the same. On June 9, 1928, the Western Light & Power Corporation submitted its written bid for aforesaid amount for said plant. On August 6, 1928, the city council passed an ordinance accepting said bid, and also passed an ordinance granting to said corporation a franchise subject to the approval of the electorate. An election was held on September 14, 1928, and resulted in favor of the sale and issuance of the franchise. The sale was subsequently consummated, a license granted, and the physical assets were transferred to said corporation. On September 10, 1928, prior to said election, the city council passed a resolution declaring that the proceeds derived from the sale of said light plant "shall be placed in a separate fund and there held separate and apart from other moneys, and shall be used only for the purpose of retiring the outstanding bonded indebtedness of the city of Woodward as the same may become payable." At that time the governing body of the city of Woodward consisted of the city council and mayor. After said election, certain taxpayers instituted suit in the district court of said county, seeking to enjoin said sale and issuance of said franchise. The Western Light & Power Corporation and the city of Woodward were made parties in that action. The district court sustained the validity of the sale, and an appeal was taken to this court, which approved the action of the trial court. Thomas v. Reid, 142 Okla. 38, 285 P. 92. While the appeal was pending in this court, a charter form of government was approved by the city of Woodward in March, 1928, whereby the governing body of the city of Woodward was changed from that of the mayor and city council to city commissioners, including a city manager. After the adoption of the charter form of government by the city, another suit was filed in the district court of said county styled "J. O. Little v. City of Woodward," wherein the plaintiff, including a number of former city officials,

sought to compel the amount which is in controversy herein, to wit, $326,000, to be placed in the sinking fund. This amount represents the balance of the sum received from the sale of said municipal light plant, after the deduction of certain indebtedness incurred for a Diesel engine, and a sufficient amount to retire the accruals and interest on the outstanding unmatured bonds, and in this way it was sought to retire all outstanding bonds of the city of every kind and character. An amended petition was filed and said plaintiff sought to enjoin the said city from attempting to construct, operate, or maintain a light plant with this fund, without first obtaining an approval therefor by a vote of the people. A temporary injunction was granted, but when the case was tried upon the merits, the court dissolved the interlocutory order, and rendered judgment in favor of the city. This case is pending in this court.

It also appears that a similar suit was commenced in the federal district court on August 13, 1930, by the Western Power, Light & Telephone Company, a Delaware parent corporation, in which the same relief was sought as in the aforesaid Little Case. In this case, a cross-appeal was filed by the city, charging the light company and said officials, who were in office at the time of the election and sale of the plant, with fraud, bribery, collusion, and corruption, and praying that the sale be set aside for said reasons. In this case, the city tendered into said court the sum of $326,000, to be returned to the purchaser in the event the city recovered judgment setting aside the sale. The city has taken the position in these suits that the sale is void, and, alternatively, if it is not void, that it has the right to spend the proceeds from said sale in constructing a new light plant, or for any other lawful purpose. The Court of Tax Review held, and, in my opinion properly so, that the city was not required to place the balance on hand in the sinking fund. The protestants appealed from this portion of said holding. The Court of Tax Review also held that the attempted appropriation was void since it was not certified to or approved by the excise board. In this, it is my opinion that the Court of Tax Review erred. The protestee appealed from this latter portion of the judgment of the Court of Tax Review. The judgment of the Court of Tax Review, as set out in the journal entry, in part, is as follows:

"The court holds that the sum of $332,-048.25, cash on hand from the sale of the light plant, and now to the credit of the light fund, does not have to be paid into the sinking fund, and might be dealt with by the city council in such ways as it may decide is the best interest of the city, but does hold the attempted appropriation on the part of the mayor and city council, appropriating for the building of additions to the city in the way of gas plants and light plants, is void and have to be appropriated by the county excise board."

The real question for review is whether or not the city of Woodward may use this $326,000 for the purpose of building and constructing a light plant, a gas plant, and sewer improvements, without a vote of the people, and without the approval of the county excise board.

When the Legislature provided under chapter 94, S. L. 1927 (O. S. 1931, secs. 6180-6185), for the sale of a municipally owned public utility, no provision was made therein for the disposition of the funds received thereby.

It is my opinion that there is no constitutional or statutory requirement which directs or compels the governing body of a city to place the balance of the proceeds from the sale of a municipally owned utility into the sinking fund, and even under what I consider purely obiter dictum announced in the case of Gulf, C. & S. F. Ry. Co. v. Excise Board of Love County, 141 Okla. 34, 283 P. 1003, after the municipality has taken care of the payment of its outstanding indebtedness against the utility which was sold, it has performed its duty to the sinking fund and met all the requirements of law in that regard. The majority opinion now attaches to this dictum in the Gulf Case, supra, the additional and advanced theory that the original amount invested should also be repaid. In my opinion there is no basis for such a view.

Article 10 of the Constitution of Oklahoma is designated "Revenue and Taxation." Revenue and taxation, in my opinion, is applied to each fiscal year for which the tax was levied and collected. The proceeds of the sale of the plant in question cannot be construed as coming within the terms of money borrowed under section 16, art. 10. The majority opinion holds as follows:

"It has been said that the strict enforcement of these constitutional and statutory limitations and restrictions against municipal indebtedness, which may require the invalidation of contracts, will often result in hardship. This may be true. * * * But the

hardships that may so arise are not comparable with those to be suffered by the citizens of this commonwealth, if these wise and salutary limitations, imposed by the people themselves against themselves, shall be swept aside, or evaded by ingenious reasoning, to meet the supposed necessities of a situation, or even the apparent equities of a particular case." (O'Neil Engineering Co. v. Town of Ryan, 32 Okla. 738, 124 P. 19).

"We, therefore, hold that the provisions of sections 16 and 27, art. 10 of the Constitution are applicable not only to the immediate use of the money borrowed, but to any subsequent use thereof, and that they apply as well to the proceeds of the sale of the property purchased with borrowed money as to the borrowed money with which the property was purchased.

"When a municipal utility, which was purchased, constructed, or repaired with borrowed money, is converted into money by reason of a sale of the property, the proceeds of the sale are controlled by the provisions of sections 16 and 27, art. 10 of the Constitution, and may be used only for the purpose for which the money was borrowed. When the proceeds of the sale are not used for the purpose for which the money was borrowed, they must be used to reimburse the taxpayers."

There is no authority cited for the annunciation of the rule therein announced, to wit:

"Where the proceeds of the sale are not used for the purpose for which the money was borrowed, they must be used to reimburse the taxpayers."

How could the taxpayers be reimbursed? What taxpayers? The opinion also holds that the amount in controversy herein was revenue on hand from the previous fiscal year or years, and that by reason of the appropriation made on the 7th of July, 1930, being the first Monday of July of that year, there was no appropriation of this fund. The court defines "revenue" as income from sources other than ad valorem tax; citing the case of Monsell v. Excise Board of Tulsa County, 142 Okla. 130, 285 P. 836. Reference to that opinion shows that the term "revenue" was defined without citation of authority, and, in the instant case, the court states that the amount in controversy herein was revenue on hand from the previous fiscal year or years. I am unable to subscribe to this view. The funds on hand are neither revenue nor levy. It represents the proceeds from the sale of a municipally owned utility plant. The opinion also holds that such a fund derived from the sale of a public utility and being on hand at the close of the fiscal year, and not appropriated by the municipal authorities, must be considered by the excise board in fixing rates of levy for municipal purposes for the ensuing fiscal year. In my opinion this is without support of charter, statutory or constitutional authority, and may lead to an impairment of the rights of many municipalities in conducting their municipal affairs. If, for instance, a public utility plant should be destroyed and insurance thereafter collected for the payment of same, standing undisposed of at the end of the fiscal year through neglect, inadvertence, or misunderstanding of the governing body of the city to make appropriations of said amount, then, according to the majority opinion, the same must be considered by the excise board in fixing rates of levy for municipal purposes for the ensuing fiscal year. It is my opinion that this view of the law as announced in the majority opinion is unsound. The Constitution fixes the fiscal year as coming on the first day of July of each year. The sinking fund ordinance for the retirement for all outstanding indebtedness, Principal and Interest Against Said Plant, and the designation of certain investment bonds to be set aside and apart within said sinking fund as an offset to said indebtedness, published on May 2, 1930, was as follows:

(Published in Woodward News-Bulletin May 2, 1930)

"Sinking Fund Ordinance No. 279.

"An Ordinance Covering the Matter of the Receipt of Monies in the Amount of Five Hundred Five Thousand Dollars ($505,000), Plus Interest, Derived from the Sale of the Woodward Municipal Light Plant: Creating a Sinking Fund for the Retirement of All Outstanding Indebtedness, Principal and Interest, Against Said Plant, and the Designation of Certain Investment Bonds to Be Set Aside and Apart Within Said Sinking Fund as an Offset to Said Indebtedness, and Declaring an Emergency.

"(Emergency Ordinance.)

"Be it ordained by the Commission of the city of Woodward, Oklahoma.

"Section 1. That cash having been received and placed to credit of the light plant fund of the city of Woodward, Okla., in the amount of $505,000, plus interest on bank deposit on said fund in amount of $2,398.75, making a total in the amount of $507,398.75.

"Section 2. Since the bonds outstanding against the municipal light plant in the amount of $152,500 are not due and cannot be paid prior to maturity unless voluntarily

surrendered by the holders thereof, therefore:

"In order to provide in full for the retirement of all outstanding bonds of the light plant, which have not previously been levied for and for which there is not now cash on hand to apply on principal, we hereby order that there be placed to the credit of the sinking fund account of the city of Woodward the amount of $122,878.76 to be held intact in such fund and together with other funds already on hand to be invested in such bonds and securities as are now held by such sinking fund of the city of Woodward, in the amount of $153,176, as hereby enumerated:

```
City Hall Bonds, Woodward _____$10,000
Park Bonds, Woodward _____ 11,000
Water Works Bonds, Woodward _____ 15,000
City Hall Bonds, Woodward _____ 36,000
Airport Park Bonds, Woodward _____ 25,000
Ardmore City Bonds _____  9,000
Woodward Board of Education Bonds ____ 34,000
Supply Electric Light Bonds _____  2,500
Canadian County Bonds _____ 10,676
```

"until such time as said light plant bonds shall mature and become payable or until they may be retired prior to such maturity, at such time said sinking fund investment securities shall revert to the credit of the other bond fund reserves on hand and such light fund bonds shall be retired with cash from such fund.

"Section 3. The entire proceeds from the investment of such funds in the above enumerated bonds and warrants shall be placed to the sinking fund account of the city of Woodward as long as they shall be held in order to offset the interest annually required to be paid on said light plant bonds until their maturity or payment.

"Section 4. The balance of the amount received from such sale of the municipal light plant, after making the above transfer to the sinking fund and after taking up all other existing indebtedness against the light plant, shall be placed to the credit of a fund known as special improvement fund and shall be carried by the city treasurer as such in depository banks of the city, properly covered by surety bond or by approved securities, until such time as may elapse until the city commission may, by appropriation, authorize its expenditure and outlay for such city improvements and capital outlay as it may deem to be to the best interests of the city.

"Section 5. The amount held to be due to the sinking fund from the light plant sale proceeds has been allocated as follows:

"Amount of reserve accruals in sinking fund and to retire light plant bonds, to and including fiscal year 1929-30 _____$ 66,566.66

"Less: Sinking fund deficit March 30, 1930, including deficit on water and other public improvement bonds, as well as the deficit on the light plant bonds $ 46,945.42

"Funds on hand to apply on the payment of principal of light plant bonds after providing for entire sinking fund deficit of the city of Woodward _____$ 29,621.24

"Add: Amount ordered transferred to sinking fund account from the proceeds of the light plant sale _____$122,878.76

"Total: The minimum amount to be carried in sinking fund reserve to be used to retire said light plant bonds at maturity __$152,500.00

"Such bonds, as itemized in section two, being in the amount of $153,176.00

"Section 6. That on account of the necessity for making up a certain deficit in the present sinking fund of the city of Woodward and in order to make immediate and proper provision for the retirement of the outstanding principal and interest of the municipal light plant bonds, it is necessary for the public peace and safety that this ordinance take effect and be in force immediately; therefore, an emergency is declared to exist and by reason thereof this ordinance shall take effect and be in full force from and after its passage, approval and publication.

"Passed by the Commission and signed by the mayor this 28th day of April, 1930; and correctly enrolled.

"J. H. Richardson, Mayor.
"Attest: Catherine Greeing,
"City Clerk. (Seal)."

On July 7th, the governing body of the city of Woodward met on the first Monday of July and made appropriations for the balance of said fund. This fund was kept in a separate fund. The same was not used to take care of any of the current expenses of said city, and how could the taxpayer be prejudiced to an appropriation being made on the 7th day of July, rather than prior to the first day of July, so long as said fund remains separate and apart from the general or sinking fund of said city, and did not constitute a part of the revenue or levy of the fiscal year in question? The excise board did not convene on the 7th of July, 1930, and, in my opinion, on that day did not and never did acquire any jurisdiction over the balance of the fund, to wit, $326,000. The issuing of the original bonded indebtedness in the sum of $30,000 and the additional bonded indebtedness for said plant, constituted a contract between the

bondholders and the city, whereby the city agreed to raise by taxation on all personalty and real property within the limits of said, city a sufficient sum to annually retire a portion of the principal of said bonded indebtedness, and to provide an annual tax in the sinking fund and take care of the interest on said bonds. This constituted an executed contract. The city was not required to take care of this bonded indebtedness except according to the face and tenure of said bonds. To my way of thinking this court, by its majority opinion, is writing another and different contract when it requires the city to pay out of this fund at this time the total amount expended by said city on said plant. The city was not required to extinguish this debt other than as represented by said bonds. There is no charter, statute, or constitutional provision designating what should be done with the proceeds of the sale of a municipal light plant. The Legislature did not see fit, when it provided under chapter 94, Session Laws 1927, for the sale of a municipally owned public utility, as to what disposition should be made of said funds.

The Supreme Court of the United States, in the case of City of East St. Louis v. United States, 28 L. Ed. 162, in an opinion by Mr. Justice Mathews, said:

"But the question, what expenditures are proper and necessary for the municipal administration, is not judicial; it is confided by law to the discretion of the municipal authorities. No court has the right to control that discretion, much less to usurp and supersede it. To do so, in a single year, would require a revision of the details of every estimate and expenditure, based upon an inquiry into all branches of the municipal service; to do it, for a series of years, and in advance, is to attempt to foresee every exigency and to provide against every contingency that may arise to affect the public necessities."

Section 6, art. 18 of the Constitution, provides:

"Every municipal corporation within this state shall have the right to engage in any business or enterprise which may be engaged in by a person, firm, or corporation, by virtue of a franchise from said corporation."

In Re Bliss, 142 Okla. 1, 285 P. 73, this court, in speaking of the aforesaid section of the Constitution, said:

"Under that provision, a municipally owned water plant may be operated as a private enterprise under legislative regulations. In our opinion this may be done,

under existing legislation, through a fund separate and apart from the current expense fund."

The record in this case shows that the city, prior to the establishment of its charter form of government, operated this plant as a private enterprise, with no ad valorem tax, and created a light and power plant fund separate and apart from the current expense fund, and that the city officials appropriated such funds and published an itemized statement as required by law.

The Court of Tax Review declared the appropriation invalid because it was made by the city officials and not by the excise board. The appropriation by the city officials was not void by reason of it not having been submitted to the excise board and approved by it. In re Bliss, supra; Protest of St. Louis-San Francisco Ry. Co., 153 Okla. 283, 5 P. (2d) 763.

The balance of the fund in controversy arose by virtue of the bonded indebtedness and earnings derived from the operation of the plant, which earnings had accumulated, from time to time over a long period of years, and which were, in part, expended in the form of enlargement, new equipment, and extensions in the plant. In fact, the fund in question is nothing more than a change of the corpus into cash, which the city now seeks to replace in another utility plant. The city had the right to make these expenditures in the development of its plant, without regard to procedure provided in the general taxation statutes, so long as the expenditure was for a lawful purpose and the city published its statement as required by law. In re Bliss, supra; In re Protest of St. L.-S. F. Ry. Co., 153 Okla. 283, 5 P. (2d) 763. The aforesaid section of the Constitution, section 6, art. 18, supra, permits the municipal corporation the right to engage in a public utility enterprise, and this may be done without a vote of the people, but if the city seeks to engage in any such public utility enterprise, and thereby create an indebtedness whereby the limitations presented by law are exceeded, a vote of the people is necessary to lend validity to such an indebtedness. In that respect the aforesaid section 6 of article 18 is not self-executing, but must be exercised in connection with sections 26 and 27, art. 10, of the Constitution.

As to the contention raised in respect to the tender of the aforesaid balance in the federal case, supra, it is my opinion that this contention is without merit, and is not subject to the order of the federal court.

In the case at bar, the Constitution of this state, section 6, art. 18, specifically provides that a municipality shall have the right to engage in a public utility enterprise. The governing body of said city submitted the sale of the utility plant to the qualified voters of said city and said sale was approved. This submission of the question to the voters did not thereby nullify the constitutional provision of section 6, art. 18. That provision of the Constitution was operative at all times so far as the rights of said municipality were concerned. The city did not grant to the purchaser of said utility plant an exclusive franchise, nor did it attempt in any manner to exclude said city from re-entering or continuing in the operation of a utility business. The municipality has the right to incur indebtedness, to make expenditures in respect to public utilities which it may be operating, and it has the right and authority to acquire, operate, and maintain a light plant, gas plant, or provide for the improvement of its sewer system, under limitation presented by law. This is a continuous right which the city enjoys. See City of Joplin v. Southwest Missouri Light Co., 191 U. S. 150, 48 L. Ed. 127.

In the instant case there is nothing in the record to indicate that the governing body of said city is contemplating incurring any general indebtedness for the purpose of constructing a light plant, gas plant, or sewer improvements in conflict with any statutory or constitutional limitation. The city has set aside a sum from said sale sufficient to take care of the outstanding bonded indebtedness as it pertained to the light and power plant so sold, and other indebtedness incurred thereby, and in the exercise of its discretion has not seen fit to transfer the balance of the proceeds of said sale to the sinking fund. It is my opinion that this is a question solely within the sound discretion of the governing body of said city, and the governing body of said city, in the absence of any special statutory, constitutional or charter provisions, may control such funds as in their judgment are advisable for the best interest and needs of said city. See Travaille v. City of Sioux Falls (S. D.) 240 N. W. 336. On this question the judgment of the governing authorities of said city, when exercised in good faith, is conclusive and must be accepted by this court. When the city of Woodward voted these bonds for the construction of the electric light and power plant, the same constituted an executed contract. See Hall v. Redd (N. C.) 146 S. E. 583. The issuance of the bonds for the indebtedness thereof created pledged the good faith and credit of the city of Woodward, and the electric light and power plant was in no way pledged by said city as security for the payment of such bonded indebtedness as is provided by law when a municipality orders special improvements to be made.

In the instant case the record shows that no plan for the construction, operation, or maintenance of a light and power plant exists which will require the incurrence of any general indebtedness, or an ad valorem tax against said municipality. It is true that the action of the governing body of said city may eventually create a condition whereby the revenue from the light or gas plant would be insufficient to take care of any building and equipment which said city might contemplate erecting, but such a question is not now before this court.

So long as said municipality seeks to operate a light and power plant for the use and benefit of said municipality from the earnings to be derived from the operation of the same and the aforesaid balance, without the imposition of an ad valorem tax, it is my opinion that there is no valid reason why said municipality should be denied such constitutional right, and not be governed in this regard by its governing authorities in the exercise of its corporate powers without submitting this question to the voters of the people in said municipality. Under such conditions there is no occasion or authority for the appropriation of aforesaid balance to be made by the excise board of said county. It is my view that the city of Woodward at all times did have, and now has, the right and privilege to be exercised by its governing body to enter at any time the utility business in furnishing light, water, and power for said city under section 6, art. 18, of the Constitution, and may appropriate for such purpose the aforesaid balance of cash on hand at the discretion of its governing body, and that it is not required to transfer the cash in question into the general or sinking fund, so long as said city does not ask for an ad valorem tax for the operation and maintenance of said plant, or for the retirement of any bonded indebtedness created for said enterprise, and said fund not being in the general or sinking fund need not be appropriated by the excise board.

KORNEGAY, J. (dissenting). Owing to the importance of the question here in-

volved, I deem it necessary to express my view in a formal way. I think that, under the law and the previous rulings of this court and the council resolution, the money that was received for the light and power plant bought of the city of Woodward, after paying off the bonds that stood against the utility that was sold, should be applied to the liquidation of bonds for other utilities and other public debts, and that if there is a surplus after this is done, it should be applied to general purposes.

The history of this matter appears in some of the briefs that have been filed on behalf of the various parties, and especially is it given in the record that is before the federal court in case No. 443 (50 F. (2d) 1087) found here, wherein the Western Power, Light & Telephone Company, a corporation, and David Reid were appellants, and the City of Woodward, Okla., a municipal corporation, C. E. Williams, J. E. Young, and J. H. Richardson, commissioners of the city of Woodward, H. M. Renner, city manager of the city of Woodward and Ida M. Warren, city treasurer of the city of Woodward, were appellees, which was filed in the Circuit Court of Appeals of the 10th Circuit on the 24th of March, 1931.

When one examines the litigation that has arisen out of these transactions, and the efforts, as shown in the record here, of one utility company competing with another utility company to buy a light plant that was municipally owned, and remembers the fight that has been waged for over a quarter of a century arising out of light and power plants, it is reminiscent of some of the worst and most far-reaching controversies among the giants who have controlled the business of furnishing light and power to the public.

When the Constitution of the state of Oklahoma was formed, there was the beginning of a recognition by the public of what the results might be, in view of the fact that water power and other powers were being sought after very greatly by those who wanted to transmit power and heat and light. There will be found in the Constitution of Oklahoma a protest against monopoly. There is also found in it provisions for an elected Corporation Commission to handle the rates of public utilities, with the power in the Legislature to enlarge the power of that Commission, the granting of franchises being made a local matter. In addition to that, there is a provision for competition by the state and by a municipality, with a view of preventing the monopoly that is denounced in the Constitution. There is special provision for financing public utilities in cities and towns, and the power of taxation is there conferred upon them, for the purpose of paying the expenses of installation and operation, and special provision for taxation to enable the state to go into business. The sections of the Constitution that are peculiarly applicable embrace section 31 of the Bill of Rights (art. 2), as follows:

"Sec. 31. State May Engage in Business. The right of the state to engage in any occupation or business for public purposes shall not be denied nor prohibited, except that the state shall not engage in agriculture for any other than educational and scientific purposes and for the support of its penal, charitable, and educational institutions"

—and section 32, as follows:

"Sec. 32. Perpetuities and Monopolies Prohibited. Perpetuities and monopolies are contrary to the genius of a free government, and shall never be allowed, nor shall the law of primogeniture or entailments ever be in force in this state."

The sections are general, leaving to the Legislature to prescribe the details of administration. Under the head of Revenue and Taxation, section 9 of art. 10 is a limitation upon the power of the Legislature, which, if unrestrained, could have taxed at will, to impose further taxes, while section 10 of that article provides that for erecting public buildings in counties, cities, or school districts, the Legislature may increase the rate, provided the rate of increase and the purpose for which intended should have been submitted to a vote of the people, and a majority of the qualified voters, voting at such election, vote therefor, with the proviso that even then 5 mills on the dollar was the limit. Section 26 of article 10 is a limitation upon the debt that can be incurred by cities beyond the revenue provided for each year, and under it by getting a three-fifths vote an excess could be incurred, but the limit of that increase is 5 per cent. of the valuation, which would have to be ascertained from the last assessment previous to the incurring of the indebtedness. That section provided for an accompanying levy of taxes to meet it.

Section 27 is the one peculiarly applicable here, and covers public utilities, confined, however, to a town or city, and the power to go in debt for them under it was conditioned that a majority of the property tax-paying voters at a special election give assent and it was limited to the proposition

of purchasing or constructing public utilities or for repairing same, and the utilities would have to be owned exclusively by the city. It is confidently believed that this section would forbid the idea of a lien of any kind being fastened upon the plant, either by legislative enactment or judicial construction, and that the only security the municipal bondholders have is the taxing power fastened upon the property of every kind in the city or town, till the bonds are paid, and the pledge by the city authorities and the people to collect the interest annually, and a part of the principal, and preserve the installments collected in a sinking fund to liquidate their demands.

Ordinarily taxation is commensurate with a demand for public purposes, but as a foundation for the curbing of monopoly and to prevent extortion, and to bring about competition, there is a special provision on the subject in the revenue and taxation law, article 10 of the Constitution. Section 14 of that article is as follows:

"Sec. 14. Taxes shall be levied and collected by general laws, and for public purposes only, except that taxes may be levied when necessary to carry into effect section 31 of the Bill of Rights. Except as required by the Enabling Act, the state shall not assume the debt of any county, municipal corporation, or political subdivision of the state, unless such debt shall have been contracted to defend itself in time of war, to repel invasion, or to suppress insurrection."

As set out in the Constitution, there are three kinds of pecuniary exactions provided for. One is judgments, and they may arise from tort or contract, the amount of which no man could foresee. A failure to keep sinking funds till maturity of bonds and their discharge would give rise to judgments. Another class of obligations was current expenses generally provided for annually, and another class of obligations was bonds that were issued for public buildings and extraordinary expenses that could not be paid out of the usual tax levies, and another class of obligations was bonds that were issued for public utilities under section 27. A key to the proposition as to what would become of the money in this particular case is found in section 28, art. 10, which is as follows:

"Sec. 28. Sinking Funds of Towns, Counties, etc. Counties, townships, school districts, cities, and towns shall levy sufficient additional revenue to create a sinking fund to be used, first, for the payment of interest coupons as they fall due; second, for the payment of bonds as they fall due; third, for the payments of such parts of judgments as such municipality may, by law, be required to pay."

That section appears to make one sinking fund, and it has been so decided by this court in the case of In re Tax Levies of City of Woodward, 143 Okla. 204, 288 P. 458. If this be true, it is rather difficult to reconcile that with the idea that in the present case only the bonds that were issued for the light plant should be taken up out of the proceeds of its sale. In that case the authority of the municipal governing body to transfer to the sinking fund any general fund balance, as set forth in the second subdivision of the syllabus, is affirmed, and it is also affirmed in subdivision 3. The syllabus, however, does not cover the caution in the opinion that is given at page 206 of 143 Okla., where the following language is used:

"While not raised as an issue in this case, for the benefit of taxing officials of this state, we desire to call attention to the fact that the excise board made a separate computation for sinking fund 'not water nor light,' 'water and light,' and 'judgments.' We have heretofore said, and now repeat, that this practice is not authorized by the Constitution or statutes of Oklahoma and that under the provisions of section 28, art. 10, of the Constitution, and the governing statutes, the sinking fund is to be computed in one item which will include bonds of all kinds and judgments and that there is no authority at law for the fixing of a rate of levy for sinking fund purposes for 'judgments' separate and apart from 'bonds'."

The Constitution requires that a fund must be provided for the liquidating of all utility bonds when authorized. They are extraordinary and stand to themselves, both in authorization and amount. See Coleman v. Frame, 26 Okla. 193, 109 P. 928, where it is stated that Oklahoma is the only state conferring unlimited power to tax to supply public utilities. The law permits unlimited indebtedness and unlimited taxes for utility purposes, though we all recognize that a great many of these utility improvements will be consumed long before the bonds are paid, and that we will perhaps visit "the iniquities of the fathers, upon the children unto the third and fourth generation." This present generation, with the depression like Egyptian darkness hanging as a pall, is going through the first stages of spending yesterday, the money that is to be earned tomorrow.

One of the cases somewhat bearing is Yarbrough, Mayor, v. Donaldson, 67 Okla.

318, 170 P. 1165, which concerned a referendum in a city for the purpose of preventing a sale of the light plant that belonged to a municipality. The court there held that it was not a legislative matter, and that, as the Legislature had permitted the disposition, the referendum law did not apply so as to allow its reference to the people who had the bills to pay. The plant, of course, without operation under a franchise, was of little value. The water in that case has gone over the wheel, but the Legislature evidently recognized that, and though in some cases this had happened, did provide a scheme on the subject, apparently to revive the "spirit of the Constitution."

Another case came along of City National Bank of Ft. Smith, Ark., v. Inc. Town of Kiowa, 104 Okla. 161, 230 P. 894, and at page 165 of 104 Okla., the following language is used:

"The grant of power to municipal authorities made by the people at any election held pursuant to this provision is expressly limited by the provision itself to public utilities 'to be owned exclusively by such city.' If municipal authorities are thus expressly prohibited from selling an interest in such public utility even for the purpose of effectuating competent management and control, it must follow indubitably that the larger power of complete disposition is not to be implied. And the reason for this is obvious. It would open a door for the exploitation of the public through collusive sales of municipally owned public utilities. Not that this result would follow in any particular case, but that it might do so, is sufficient reason for the public policy which forbids it. The incorporated town of Kiowa acquired its water and light plant through a bond issue in conformity with the provisions of section 27, supra. It is therefore concluded that no express or implied power has been vested in municipal authorities in this state to sell or otherwise dispose of a municipal water and light plant, acquired under section 27, art. 10, Const., unless the same has * * * become inadequate and is not adapted to the public uses for which it was originally intended."

The Legislature appears to have taken a hand by the enactment of the revocable permit law in the year 1925, so that the utility companies might apply, and exchange with the sanction of the Corporation Commission, their municipal franchises for a revocable permit. That repealed everything in conflict with it, and was approved March 15, 1925, and became effective without the emergency, the Legislature ending on the 28th of March so that it became operative on the ninetieth day thereafter. The result of this on the Corporation Commission was that they were forced to obey, or resist another department of government on the ground of unconstitutionality. They were "damned if they did and damned if they didn't," if one may be excused for using a common phrase, "forcible though perhaps not elegant."

At Okmulgee appears to have been one of the early cases on the subject, combating the irrevocable permit law. The history of the matter in part is recited in the decision of this court in the case of City of Okmulgee v. Okmulgee Gas Co., 140 Okla. 89, 282 P. 640. It appears from the recital that, on the 24th of November, 1925, the city of Okmulgee started injunction proceedings to get rid of a permit issued under that law, and that on the 25th of April, 1927, the city lost in the lower court, and it was appealed and brought to this court and an opinion was filed November 5, 1929, and rehearing denied December 10, 1929, holding the act unconstitutional.

The full history of it is recited in the case of City of Okmulgee v. Okmulgee Gas Co., 141 Okla. 98, 284 P. 70. That was an appeal from the Corporation Commission itself, and on the 18th of July, 1925, according to the recitals in the opinion, the Corporation Commission overruled the protest of the city of Okmulgee against the granting of this revocable permit, and on the 15th of January, 1926, appeal from the action of the Corporation Commission was lodged in this court, followed by an opinion in this court on January 14, 1930, holding the revocable permit law unconstitutional and void. While the appeal from the Corporation Commission was pending here, the city of Okmulgee brought the injunction proceeding to restrain operation under the permit. The Legislature again took up the matter in chapter 94, Sess. Laws, 1927, p. 155 [O. S. 1931, secs. 6180-6185] by an act that was passed and approved April 7, 1927, at which time this appeal was pending. The law is as follows:

"An Act prohibiting the governing body of any municipal corporation organized and incorporated under the laws of the state of Oklahoma, from selling, leasing, conveying or otherwise disposing of any public utility belonging to such municipal corporation, when the actual cash value of such utility belonging to a city of the first class shall exceed $10,000, and a town or village $5,000, unless such sale, lease, conveyance or other disposition of such utility shall be authorized by a vote of sixty (60%) per cent. of the qualified voters of said municipality, voting at an election called for such purpose, providing for the manner of holding such election and selling such municipal plant when authorized.

"Be it Enacted by the People of the State of Oklahoma:

"Public Utilities—Sale—Election.

"Section 1. That no public utility owned by any municipal corporations, organized and incorporated under the laws of the state of Oklahoma, where the cash value of such public utility in a city of the first class exceeds $10,000, or in a town or village where the actual cash value thereof is in excess of $5,000, shall be sold, conveyed, leased, or otherwise disposed of, by the governing body of such municipality, unless such sale, lease, conveyance, or other disposal of such utility shall be authorized by the vote of sixty (60%) per cent. of the qualified voters of such municipality, voting at an election to be held for such purpose.

"Same—Procedure for Sale.

"Sec. 2. The procedure for the sale of such public utility shall be as follows, to wit:

"The governing body of any municipal corporation herein defined, which shall desire to offer for sale or lease any public utility belonging to such municipality, shall by resolution or ordinance authorize the proper executive officers of such municipality to give notice that on a specified day it will receive open bids for the sale or lease of such public utility, by publication in four (4) consecutive issues of a weekly newspaper published in such municipality, or if none be published therein, then in a weekly newspaper of general circulation in the county in which such municipality is situated, the first publication to be at least 30 days before open bids will be received. If the highest and best bid made for the sale or lease of such public utility on said date is satisfactory to the governing body of such municipality, then such governing body shall by ordinance call an election for the submission of the question of the proposed sale or lease of such public utility to such highest and best bidder aforesaid, and at the same time shall, by ordinance, call an election for the purpose of submitting the question of the granting of a franchise to such bidder aforesaid, which said election shall be called for the same day. The sale of such utility to be conditioned upon the franchise being granted to such bidder by vote of the people at the election called for such purpose. Such election shall be held as now provided by law for the granting of franchise.

"Sale—Franchise—Conveyance.

"Sec. 3. If such sale shall be authorized as herein provided, and such franchise shall be granted, the executive officers of such municipality shall by proper legal instruments, convey such utility to said purchaser.

"Sale—Cash Bids.

"Sec. 4. That the sale of any public utility, when authorized as herein provided, shall be for cash to the highest and best responsible bidder as hereinbefore provided, and each bid shall be accompanied with a certified check payable to the clerk of such municipality, for ten per cent. of the amount bid, which check shall be cashed by the treasurer of such municipality, if the bid to which the same is attached shall be accepted, the proceeds thereof held to secure the city in damages it might sustain upon the failure of the bidder to pay the amount bid for such utility, and the balance of the purchase price shall be payable in cash by such successful bidder upon the execution and delivery of proper legal conveyances and of the property thereby conveyed; such public utility shall not be delivered, nor shall the right to participate in any portion of the income derived therefrom accrue to the purchaser until full payment in cash of the amount of the bid for such utility and such purchaser shall only be entitled to income accruing after the completion of such sale; securities in which the treasurers of cities, towns and villages are authorized by law to invest sinking funds may be accepted in lieu of cash.

"Same—Owner of Competing Utility.

"Section 5. If the highest and best bidder for such public utility under the procedure herein defined, shall be the owner of a competing utility operating under a valid franchise or permit, it shall be necessary only to submit to the qualified voters, the question of the sale of the municipal utility.

"Lease—Charter Authorization.

"Section 6. That it is further provided that the governing body of any city of the first class, organized and incorporated by special charter adopted at an election held for such purpose, when authorized by such charter, may sell, convey or lease any public utility owned by such municipality operating under special charter without the calling of an election as provided herein."

Acting under this law, the city council of Woodward, under the aldermanic form of government, made the proposal and the people voted upon the franchise and also upon the right to sell. Sixty per cent. of the voters who voted did not vote in the affirmative to sell it. However, the price that was gotten was very alluring, and at page 106 of this record probably the reason for the price is shown. An offer of the assignment of the franchise, granted a Kansas corporation, to an Oklahoma corporation, was submitted in evidence and objected to, and the following occurred.

"Judge Walden: I want to ask a question: About this power company, is this another O. G. & E.? Mr. Barry: No, it is a competitor of the O. G. & E.. Judge Walden: Is it one of those combine concerns? Mr. Barry: It is the only light plant they own

in Oklahoma. Mr. Gibbens: The O. G. & E. tried to buy it and they raised it. Judge Walden: Is it a Santa Fe concern? Mr. Gibbens: No, sir; we represent the O. G. & E. and they tried to get it. Judge Walden: That has no business in the record. Mr. Barry: We object to the assignment as incompetent, irrelevant and immaterial. Judge Newman: Overruled. Mr. Barry: Exception."

It appears from the record that, just a few days before the election, the council took action and passed a resolution to pass the proceeds of the sale to a fund to retire all the indebtedness of the city. The resolution can be found in the record of appeal to the 10th Circuit, referred to above, at page 23, as exhibit "C," which is as follows:

"Whereas, the city of Woodward has recently entered into a lease contract with Fairbanks, Morse & Company, for the leasing of one Fairbanks-Morse engine now in use in the city light plant, and whereas, in said contract the city of Woodward is given an option to purchase said engine according to the terms of said contract;

"And, whereas, an election has been duly called for the purpose of submitting to the qualified electors of the city of Woodward, the question of whether or not the city shall sell to the Western Light & Power Corporation, the electric light plant of the city of Woodward at the agreed price of $505,000, it being provided, however, that in the bid of said proposed purchaser that the said sum of $505,000, is to be for the light plant complete, with all liens and incumbrances paid in full, and providing further that the city may exercise its option and purchase said Fairbanks, Morse engine, or that the said purchaser will deduct from said bid of $505,000, the amount necessary to take care of said lease contract, and;

"Whereas, said purchaser has agreed to pay to the city of Woodward, in the event it becomes the purchaser, the consideration of said light plant in cash or bonds, at the option of the city.

"Now, therefore, be it resolved, by the mayor and council of the city of Woodward, Okla., that, in the event the people of the city of Woodward shall determine to sell said light plant on the 14th day of September, 1928, at the election called for that purpose, that the mayor and council of the city of Woodward do require of the said Western Light & Power Corporation that they do assume the contract which the city now has with Fairbanks, Morse & Company, and that the said Western Light & Power Corporation do purchase said engine under the option reserved in favor of said city, taking advantage of all discount available, giving the city of Woodward the benefit of said dis-

count. That the amount necessary to pay for said engine shall be deducted by the said Western Light & Power Corporation from the purchase price agreed to be paid to the city of Woodward, and that the balance of said purchase price shall be paid to the city of Woodward, in the outstanding bonds which are the legal obligation against said city in so far as the same are available without paying a premium, and that the balance of said purchase price be paid to the city of Woodward in United States government bonds at par value and that said bonds, and the interest which shall accrue thereon, shall be placed in a separate fund and there held separate and apart from other moneys, and shall be used only for the purpose of retiring the outstanding bonded indebtedness of the city of Woodward, as the same may become payable.

"Passed and adopted this the 10th day of September, A. D., 1928.

"Peter Martinson, Mayor.

"Attest: S. J. Dohrer, City Clerk
"(Seal)

"We agree to abide by the terms of the within and foregoing resolution.

"Western Light and Power Corporation.
"By R. H. Jarvis.
"Its Vice President."

The question of the sufficiency of the election became res adjudicata in the case of Thomas v. Reid, 142 Okla. 38, 285 P. 92, decided by this court January 21, 1930, affirming the action of the district court of Woodward county, holding that the provision in the act, requiring a 60 per cent. favorable vote, violated the spirit of the Constitution. Sixty per cent. was not secured favorable to the sale, but over 50 per cent. did vote for it.

The principles that are applicable in a case of this kind are fairly well illustrated in the syllabus to Bank v. Kiowa, referred to above, and are laid down very forcefully in Pond's work on Public Utilities (3rd Ed.) chapter 18, entitled "Sale of Property Providing Municipal Public Utilities."

The principles are there expressed in clear terms, and this work appears to be a standard work on the subject. Quotation at length is warranted, though at the expense of brevity:

"435. Municipal Control by Limitation on Alienation. The ease with which municipal corporations may themselves provide municipal public utilities or control them in the hands of private capital depends, in an inverse ratio, upon the power which corporations providing such utilities have to alienate their property. For experience has shown that in almost all cases private corporations

stand ready to take over the operation of municipal public utilities where municipal corporations become embarrassed or are found to have made a failure of their operation. Indeed, it has sometimes been charged that influences have been brought to bear to secure an inefficient operation by municipal corporations of such public utilities, with the purpose in view of cultivating among the people a feeling hostile to municipal and favorable to private operation. And obviously the power of municipal and state regulation and control over the privately owned municipal public utility is greatly enhanced by limitations placed on the power of such corporations to sell and convey their property which is useful and necessary in providing its public utility service.

"436. Attitude of Courts on Municipal Control and Ownership.—The position of our courts in regard to the power of municipal corporations to dispose of their municipal public utility plants has therefore an important bearing on the question of the attitude of the courts toward an increase in the sphere of municipal activity as determined by the matter of the ownership or control of municipal public utilities. This control is now generally supplemented, if indeed it is not supplanted, by state public utility commissions, which have taken the place of the control heretofore attempted to be secured by competition or by the municipalities themselves.

"437. Trust property devoted to public use cannot be sold without statutory authority.—The supplying of municipalities and their citizens with such public utilities as gas, water, electric light, transportation and communication for public and private use by the municipal corporation or by private capital is the performance of a public duty, and the property so used is charged with a public trust and is devoted to a public purpose. Such property is dedicated irrevocably to the performance of this trust due the public and for its benefit and that of the inhabitants of the municipality. It is a fundamental principle that the trustee cannot disable itself from performing the trust by disposing of the property or means necessary to carry out the purpose of the trust relation without express authority from the party creating the trust or directing its administration. The power does not inhere in the trustee to defeat the carrying out of the trust by disposing of the trust property. The interests of the beneficiaries under the trust are guarded against any loss on this account and conserved by the courts holding that such property cannot be disposed of by the municipality or other corporation owning it unless under authority conferred specially by statute. The state alone, which attends to the matter of creating these trusts as well as to the selection of the trustees, has the power to provide for their destruction by

sale or for their diversion as to trustees by lease or assignment. Having the sole power to create, the state alone has the ability to provide for a change of trustee or a winding-up of the trust entirely; so that in the absence of express legislative authority the courts refuse to imply the right in the municipal or other corporation, after having accepted the trust, to renounce its duties thereunder or to dispose of the trust property and thus defeat the further carrying out of the trust. Such corporation must continue to perform its duties to the public after having once assumed the trust and undertaken to serve the public needs of municipalities and those of its inhabitants.

"438. Duty to Render Service Personal.— When the power to own and operate such plants for supplying public utilities has been granted to and accepted by any corporation, a franchise is conferred upon it for the purpose of securing some advantage to the public and for the benefit of the inhabitants in their private capacity. Such beneficiaries have the right to complain in the case of its relinquishment. This rule is based on the general principle of trusts as well as upon the rule that quasi-public corporations are formed in order to serve the public. The duty imposed is a personal one and the right to perform it, together with the special privileges pertaining thereto, is granted personally as a franchise, on condition that the grantee continue in personal control of such power and in the performance of its duties. The carrying out of the duties of serving the public under such a franchise is regarded as of special importance and the obligation is recognized as being peculiarly personal. Having selected a particular corporation which is responsible and capable of executing the duties of the trust to the public for which are granted special privileges, amounting in most cases practically to monopolies, the law does not permit it to transfer its rights and the accompanying duties to another party which may or may not be responsible and capable of adequately serving the municipality and its inhabitants.

"439. Alienation of Property Permitted in Public Interest. If at any time it may appear that the interests of the beneficiaries could be best served by some party other than the original grantee, the state which granted the franchise may in its discretion permit such change of grantees, but this must be provided for expressly by the statute. This rule of law is strictly adhered to because it is believed that the interests of the public are thereby best conserved. For observation and experience seem to indicate that the interests of the public are not paramount as to private parties who engage in furnishing these public utilities. The desire for dividends actually seem to predominate over that of serving the best interests of the public except in an increasing

number of instances where fortunately the two purposes are regarded as consistent and, identical. However, in many cases the motive of immediate profit controls, which fact requires very extensive control to be exercised over the private grantees of such, franchises or, in lieu thereof, where there is not sufficient control to insure that the public will be served adequately and at fair cost for the service, it becomes necessary that the public serve itself directly or that it have the control which accompanies ownership, while the actual operation is provided for by a leasing of the plant owned by the city. This matter, however, is reserved for later discussion and an examination of the authorities for the foregoing statements will now be attempted."

Headnotes to some of the subsequent sections are as follows:

"440. Municipal water-works public property like parks.

"441. Municipality trustee for public of its water and light plant.

"442. Transfer of property by lease must be authorized by statute.

"443. Duty to serve public can not be evaded by alienation.

"444. Municipal ownership conserved for public interest.

"445. Public interest and private gain antagonistic.

"446. Abandoned property may be alienated by municipality.

"447. Pipe lines on failure of gas may be alienated in public interest.

"448. Transfer to municipality favored in interest of public.

"449. Municipal option to purchase provided in franchise.

"450. Legislative authority must be express to permit transfers.

"451. Franchise personal to grantee and not transferable.

"455. Forced sales of such property also prohibited.

"456. Right of alienation expressly given by statute valid."

In view of the decision of this court in Thomas v. Reid, cited above, and in accordance with the recital of the majority opinion, it must follow that the money, the distribution of which is here involved, in this case, is derived from the sale of a utility plant, bought with the proceeds of bonds issued pursuant to section 27, art. 10, of the Constitution. Under that section, it required the vote of a majority of the tax-paying voters to acquire the utility. If that utility,

while a going concern, is to be sold, what answer is there to a proposition that it must be authorized by a vote of the taxpayers, under the doctrine laid down in some of the sections in chapter 18 of the work quoted from? If that question is obviated, then the question arises as to what authority there is for the distribution of the funds primarily.

Section 28 of art. 10, of the Constitution, quoted above, contemplates a sinking fund, out of which all bonds as well as all judgments are to be paid, and whether there was a special appropriation of the proceeds made by the city council, when it passed the resolution set out above for the guidance and persuasion of the voters, perhaps is immaterial, as the Constitution is plain as to the sinking fund requirement.

The language of section 27, art. 10, is clear that the body conferring the power to acquire the utility was the tax-paying voters, whether it be for an original acquisition or for repairs. It is further clear that the constitutional provision is "to be owned exclusively by such city," and that once so acquired it was a trust property of the highest order. Under ordinary conditions, the body that was empowered to provide for the acquisition and for the repair was the property tax-paying voters, and the subject of taxation for these utilities was entrusted to the tax-paying voters.

Under the conditions here existing, if any necessity arose for the disposal of the public utility, it was necessary to get legislative consent, which, it appears to the writer, is the general legislative body of the state acting pursuant to constitutional provisions. It prescribed the conditions. The voters had before them the resolution of the council, when they voted on the question as to how the proceeds should be applied, prescribing that the proceeds should go to the fund to retire debts. Good faith with the voters, if they are the ones to pass on it under the statute, requires that the proceeds should be applied accordingly.

The decisions of this court are numerous on the subject of the expenditure of public funds, and on legislative power in the application of constitutional provisions. Applicable here are some decisions with reference to the highway, one being the application of control of the department by this court in the routing of highways, and the expenditure of public moneys, and the other the decision of the court upon the constitutionality of the legislative act on the subject of the removal of a highway commis-

sioner. See Wentz v. Dawson, 149 Okla. 94, 299 P. 493, concurred in, by all the members of the court except one who was absent and not participating. See the recent case of Thomas v. Wentz, decided Sept. 23, 1932, 159 Okla. 124, 15 P. (2d) 65. The first case affirms that a promise to the voters must be kept; the second that the Legislature should be allowed to function unless it violate special prohibitions of the Constitution.

As applied to the present case, the Legislature gave its consent to the sale of the light plant, provided that 60 per cent. of the voters, who voted thereon, voted for it, evidently overlooking the proposition as to what class of voters were required by the Constitution to sanction the acquisition and repair of utility plants publicly owned. In the litigation that has followed this act of the Legislature, as illustrated in the city of Woodward, there is an unparalleled situation, as disclosed by the record. The franchise was granted and the sale was made to a Kansas corporation, which in turn was owned by a Delaware corporation. Apparently, without legislative sanction, the Kansas corporation transferred the property and franchise to an Oklahoma corporation by the same name. The money to pay the city was apparently furnished by a Delaware corporation and apparently secured from a trust company in Illinois, judging from the recitals contained in the suit in the federal court, that was instituted for the purpose of preventing the authorities of the city of Woodward from diverting the funds in this case into the construction of an electric power plant in the city of Woodward. Some of the allegations, found at page 6 of the record in the federal court that is attached to the record here, are as follows:

"8. The Western Light & Power Corporation, a Kansas corporation, accepted said conveyances and an assignment of all of said city's contracts and all obligations incumbent upon said city to perform by virtue of its ownership and operation of said electric power plant, distribution system and business connected therewith, and immediately thereafter the Western Light & Power Corporation, a Kansas corporation, conveyed to Western Light & Power Corporation, an Oklahoma corporation, all real and personal property, contracts, and all other property of every kind or nature received by it from the city of Woodward, Okla., including the business connected therewith, the good will and going concern value of said business; and said Western Light & Power Corporation, an Oklahoma corporation, assumed all the obligations of the Western Light & Power Corporation, a Kansas corporation, under its contract with the city of Woodward, Okla., and became the beneficiary of all of the covenants and obligations of said city, as provided in its contracts, expressed and implied.

"9. Plaintiff further alleges that it owns all of the common capital stock except directors' qualifying shares of the Western Light & Power Corporation, a Kansas corporation, and owns all of the common capital stock except directors' qualifying shares of Western Light & Power Corporation, an Oklahoma corporation; and that it advanced all funds and moneys necessary to purchase said electric power plant, distribution system, and business connected therewith. That for the purpose of securing indebtedness due it on account of said advancement of said the Western Light & Power Corporation, an Oklahoma corporation, executed and delivered its bonds, due on February 1, 1948, in the sum of $330,500; and for the purpose of securing said bonds, it executed, acknowledged and delivered, through its proper officers, who were then and there duly authorized by proper corporate action so to do, its supplemental trust indenture in favor of Aksel K. Bodholdt, and the Central Trust Company of Illinois, trustees, whereby it conveyed to said trustees, subject to the limitations therein set forth, for the benefit of the holders of said bonds, all of the property hereinbefore described. Said supplemental trust indenture was duly recorded in the office of the county clerk of Woodward county, Okla. Said bonds are outstanding and unpaid and are at this time owned by this plaintiff; and by virtue of said supplemental trust indenture this plaintiff has an equitable interest and ownership in all of said assets hereinbefore described and sold by said city of Woodward; and as a result of said supplemental trust indenture it has a lien upon all of said assets, in addition to said equitable interest and ownership therein. That Western Light & Power Corporation, an Oklahoma corporation, has issued and outstanding other bonds which are secured by trust indentures to the same parties upon other property, and it does not have assets over and above such bonded indebtedness sufficient to pay, indemnify, or secure its indebtedness; and in the event any of said security is impaired in any manner this plaintiff will suffer loss in an amount equal to the value of said impairment, and said loss will be irreparable and this plaintiff cannot recover any portion thereof from said Western Light & Power Corporation, an Oklahoma corporation."

It is observed also that in the progress of the litigation a charter, changing the form of government and legislating the original town authorities out of office, was hauled from the gubernatorial archives where it

had slumbered for the proverbial seven years. The election for its adoption was held the 29th of July, 1921, and the charter was approved by the Governor March 5, 1929.

It appears to me that doing this, to use a common expression, was "hitting below the belt," and that the authorities of the city of Woodward should have been allowed to keep faith with its voters. Having dealt with the corporation and having gotten such a handsome price for its plant, except as a matter of self-defense, the city of Woodward should not again enter the field, but should see that the charges of this Oklahoma corporation are reasonably regulated, and this public service corporation be required to render service. Apparently, the original governing body sought to safeguard and provide for paying debts with proceeds in accordance with the accepted resolution. A survey of the situation, as shown by the history of the entire legislation and litigation, is reminiscent of some of the expressions in one of the plays of the great dramatist of the 16th century, and a popular ballad of the 20th century, and some popular shibboleths, paraphrase of which is represented in the following lines:

"East side, west side, and all around the town,

"North side, south side, Oh! how they shake 'em down!

"They play a jazz and dance, to tune of 'nunc pro tunc,'

"The people's pawn, a child! The boat of hope is sunk."

As it appears to me, it is time to end the long saturnalia of debt creation for others to pay, and that the "hand-writing on the wall," portrayed in the Book of Daniel, is not confined to the dance halls of a mighty king, but is pictured in the cloud, and if the radio does not deceive, is now reflected nightly from the stratosphere.

The proper solution of the difficulty is to apply the funds in this case in accordance with the resolution, made by the city council when the matter was submitted to the voters, to pay the debts as therein agreed, and pass not to the next generation the burden of paying for what the present is consuming.